# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| BETHSAIDA GOMEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 6212 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The plaintiff, Bethsaida Gomez, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Gomez asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Ms. Gomez applied for DIB on March 1, 2010, alleging that she has been disabled since January 31, 2010, due to asthma, anxiety, leg pain, stress, fibromyalgia, and memory loss. (Administrative Record ("R") 146-49, 179). Her application was denied initially and upon reconsideration. (R. 71-76, 78-81). Ms. Gomez then filed a timely request for a hearing before an administrative law judge. (R. 83-90).

An ALJ convened a hearing on April 4, 2012. (R. 36-70). Ms. Gomez, represented by counsel, appeared and testified and Pamela Tucker testified as vocational expert. On May 4, 2012,

the ALJ denied Ms. Gomez's application for DIB because she retained the capacity to perform a limited range of light work, which made her capable of performing her past work as a mail clerk, as well as other jobs that exist in significant numbers in the economy. (R. 16-31). The ALJ's decision became the Commissioner's final decision on July 1, 2013, when the Appeals Council denied Ms. Gomez's request for review. (R. 1-6). See 20 C.F.R. §§404.955; 404.981. Ms. Gomez appealed that decision by filing suit in this Court under 42 U.S.C. §405(g), and both parties consented to jurisdiction pursuant to 28 U.S.C. §636(c).

## II.
## THE EVIDENCE

### A.
### The Vocational Evidence

Ms. Gomez was born on November 30, 1961, making her fifty years old at the time of the ALJ's decision. (R. 175). From 2006 to 2010, she worked as the manager of a currency exchange. Prior to that, she was a claims adjuster for an insurance company, and from 1996 to 1998, worked in a mail room. (R. 180, 185-87, 196-202). This work ranged from sedentary to medium, and was semi-skilled or skilled. (R. 58).

### B.
### The Medical Evidence

Ms. Gomez's problems appear to have begun with a motor vehicle accident in which she suffered multiple injuries. (R. 401). She saw her regular doctor, Dr. Janis Wiener, on July 22, 2011. She had back pain and numbness in her right leg, but gained some improvement through physical therapy. There was no muscle weakness or joint pain. Musculoskeletal and neurological exams

were normal aside from right low back tenderness. (R. 407). Asthma was well-controlled. (R. 405).

On July 30th, Ms. Gomez went back to Dr. Wiener, continuing to complain of low back pain. As well as forgetfulness and fatigue, she had no complaints. (R. 403). Upon examination, recent and remote memory were normal. Mood was normal. Insight and judgment were good. Musculoskeletal exam was normal with the exception of some mild tenderness in the low back. (R. 403). The doctor noted that an MRI had revealed mild disc protrusion as L4-5. (R. 340, 401). Ms. Gomez had "persistent" symptoms despite physical therapy. (R. 401).

The disability agency arranged for Ms. Gomez to have a consultative exam with Dr. Sujatha Neerukonda on August 25, 2010. She explained that she had been experiencing back pain for 8 years, fibromyalgia for 10, depression and anxiety since age 17 (although it had gotten worse recently), asthma since childhood, and left shoulder pain for a year. (R. 344). The shoulder pain averaged a 5/10, the back pain a 6/10. She claimed she had an acute asthma attack in July 2010 and had to go to the hospital. She panicked around people and crowds, slept only 3 hours a night, and had crying spells. The doctor noted she appeared severely depressed and cried during the examination. (R. 345, 346). Upon examination, there was bilateral wheezing when Ms. Gomez breathed. Range of motion in the cervical spine, shoulders, elbows, wrists, hips, knees, and ankles was normal. Lumbar spine motion was limited to 70 of 90 degrees. There was mild tenderness at L4-L5. Straight leg raising was negative for radiculopathy and gait was normal. Neurological examination was normal. (R. 346). She had "18+" fibromyalgia pressure points. (R. 348). Dr. Neerukonda's diagnoses were chronic fibromyalgia, thoracolumbar arthralgia, depression, anxiety disorder with panic attacks, and chronic bronchial asthma and sinusitis. (R. 347).

That same day, Ms. Gomez also had a consultative psychological examination with Dr.

3

Nathan Wagner. Ms. Gomez related suffering anxiety, frequent panic attacks, depression, low energy, poor concentration and focus, and poor sleep. (R. 356-57). Her panic attacks affected her ability to find work, as she could not complete tests or interviews. Her condition was worsened by family stress – her daughter died at age 3 and her son attempted suicide on two occasions. (R. 357). She left her previous job at a currency exchange because she became overwhelmed physically and emotionally. (R. 358). The doctor noted that, Within the first two minutes of the exam, Ms. Gomez was in tears. She regained her composure but hyperventilated and sobbed from time to time during the rest of the exam. (R. 359). Her mood was depressed and her affect labile. There was no thought disorder. Memory was somewhat deficient but grossly adequate. She was unable to identify Martin Luther King or Thomas Edison. (R. 360). She had some difficulty with abstract thinking. Judgment and insight were grossly intact. (R. 361). Dr. Wagner diagnosed panic disorder with agoraphobia, anxiety disorder, and major depressive disorder. He assigned a Global Assessment of Functioning score of just 30, suggesting behavior considerably influenced by an impairment or an inability to function in almost all areas. (R. 362); http://www.gafscore.com/.

    On October 18, 2010, Ms. Gomez saw Dr. Amish Patel at the pain center. She was having back, hip and neck pain present, as well as headaches, but leg pain was 100% resolved. There was tenderness in the cervical spine but straight leg raising was negative. (R. 430). Ms. Gomez had bilateral epidural steroid injections at L4-5 on November 18th. (R. 424). On November 2010, an MRI of Ms. Gomez's cervical spine showed cervical spondylosis most pronounced at C6-7. (R. 412-13). December 2nd, Ms. Gomez reported 75% improvement of her low back and lower extremity pain. She had no radiculopathy and experienced only some occasional "heat" in her lower back. (R. 428). Her new complaint was neck pain radiating into her upper arms. (R. 428). She had a cervical

spine injection on December 16th. (R. 435).

In January 2011, Ms. Gomez's physical therapist reported that, after nine visits, she was making good progress. Cervical pain was 6/10 at worst, and 4/10 on average. Upper extremity pain was 5/10 and 3/10 and headaches were 3/10 and 1.5/10. Ms. Gomez could reduce her headache pain consistently with her exercises. Still, Ms. Gomez wished to discontinue appointments because she was burnt out after attending physical therapy for 18 months. She would do home exercises instead and use a TENS unit. (R. 476, 480).

Ms. Gomez returned to Dr. Wiener on January 4, 2011. Asthma was well controlled; Ms. Gomez had stopped taking Lyrica and complained of shaky hands and anxiety, although she felt better on Effexor. (R. 451). Exam revealed full range of neck motion, normal gait and normal neurological examination. (R. 452-53). On April 13th, Ms. Gomez reported exacerbated asthma symptoms due to a cough, but back and neck pain were better after steroid injections, and depression was controlled with Effexor. (R. 446). She was having no headaches or fatigue. (R. 448). Neck range of motion was full and musculoskeletal exam was normal. (R. 449). Two weeks later, Ms. Gomez reported anxiety and sleep disturbance. (R. 442).

On May 12th, Ms. Gomez returned to see Dr. Patel with complaints of increased pain and recurrent pain in areas where it had previously resolved. She felt frustrated and that she had regressed in her condition. There was mild tenderness in along the cervical spine and increased crepitus on range of motion. Neurological exam was normal. The doctor noted she was emotional and opined that familial stress was contributing to her worsened condition. (R. 482). On June 9th, she continued to report pain in her neck, back, left shoulder and arm, with her worst pain in her right leg. She rated her pain at a 4/10, but said it increased to 10/10 especially in her right leg. She was

anxious about travel to the city for an appointment at the rehabilitation institute and wondered if there was another option. There was shoulder pain upon range of motion, but remainder of range of motion studies were normal. Neurological exam was normal. (R. 484).

Ms. Gomez had another epidural injection in July 2011 and reported good relief. Her pain was 3/10. Examination revealed tenderness in her trapezius muscles. Range of motion was normal in all extremities. Ms. Gomez reported that she had gone to the rehabilitation institute after al and had been referred for psychological therapy. Trazadone was helping her sleep. Dr. Patel felt she had diffuse pain consistent with "a chronic pain type picture and myofascial pain. (R. 489-90).

On July 28, 2011, Dr. Patel filled out a "Pain Report" form from Ms. Gomez's counsel. (R. 473-74). Confusingly, he indicated he had been seeing Ms. Gomez since August 11, 2011 (R. 473) – or a month after he filed out the form. So it's more likely he'd been seeing her since August of 2010, or for almost a year. Dr. Patel indicated that Ms. Gomez experienced pain in her low back, neck, right lower extremity, shoulders and upper extremity. (R. 473). He wrote that her complaints were not reasonably related to any physical condition, but were due to "chronic pain syndrome and central sensitization." (R. 473). The doctor explained that Ms. Gomez experienced pain from prolonged sitting and standing and that her pain increased with bending. (R. 473). Her pain was chronic, not acute. (R. 473). It was relieved by medication and steroid injections, although not completely. (R. 474). Ms. Gomez's pain impacted her ability to sustain concentration and attention. (R. 474). Dr. Patel wrote that he could not say whether her pain would affect her ability to work because there were psychological factors in play. (R. 474). The psychological stressors – Dr. Patel did not say what these might be – were playing a role in Ms. Gomez's ability to return to work. (R. 474).

6

On August 30th, Ms. Gomez reported left arm and elbow pain, as well as knee pain and swelling after walking. She said she got relief from a Butrans patch and rated her pain at just 2/10. She was seeing a psychiatrist. Range of motion in the knees was good and there was no tenderness. There was tenderness in the left arm. Neurological exam was normal. He advised her to stop taking Tramadol – he had not been aware she was taking it – as it might be causing her nausea and headaches. (R. 491-92).

Ms. Gomez had an MRI of her left shoulder on September 9th, which revealed a tendon tear. (R. 493). She had arthroscopic surgery to repair the rotator cuff on October 13th. (R. 496). She was put on morphine and hydrocodone and was going to physical therapy. She told Dr. Patel that she experienced a recent increase in her neck and low back/right leg pain. Left shoulder range of motion was decreased and there was mild tenderness. Neurological exam was grossly normal. Dr. Patel indicated that Ms. Gomez's expectations about pain reduction might not be realistic. He noted that, although she was on increased medication, she reported increased pain. (R. 499).

Ms. Gomez had a second arthroscopic procedure on her shoulder on March 1, 2012. (R. 501). As of March 12th, her pain was much better. She was using a continuous passive motion exercise machine. X-ray revealed moderate arthritis and degenerative changes in her right knee. (R. 504).

## C.
### Administrative Hearing Testimony

#### 1.
#### The Plaintiff's Testimony

At her hearing, Ms. Gomez testified about her work history. She explained that she had to quit her most recent position of manager of a currency exchange due to her injuries and her

7

fibromyalgia. She was unable to lift what she had to and she was unable to do transactions at the proper pace. She was in a lot of pain while she worked. (R. 42). She considered getting her hours and responsibilities cut back but her employer said that was impossible. Even so, she knew she would have had to quit in the long run due to her pain. (R. 43).

Now Ms. Gomez attends physical therapy a couple of times a week for one hour. (R. 45). Essentially, she had been in physical therapy for one condition or another for three years. She stretches and uses a CPM machine at home. (R. 45). This helped but didn't alleviate the pain altogether. (R. 50). She thought her doctors didn't understand the level of pain she was in. (R. 51). But she knew something was wrong. (R. 51). She explained how they had misdiagnosed her shoulder pain as radiating from her neck when it turned out to be a torn rotator cuff. (R. 51).

Ms. Gomez said she began seeing a psychiatrist but her insurance wouldn't pay for it. She didn't know what happened. She knew she needed therapy because of easily she cried. (R. 53). She had panic attacks where she felt like she couldn't breathe. (R. 54). She had troubling finishing tasks. (R. 55). She suffered from fatigue a lot. (R. 56).

Ms. Gomez explained that she had difficulty reading because she was unable to focus. She watched TV and did what she could around the house – mostly little things. She was able to make a simple dinner, but her son cooked most of the time. (R. 45). She could make a sandwich. She thought she could maybe lift 2 or 3 pounds. (R. 46). She could stand for about 10 minutes before she suffered pain. She could sit for 5 or 10. The pains she experienced caused her anxiety. She had difficulty sleeping and became exhausted by afternoon. She needed a pill to get to sleep. (R. 57).

## 2.
## The Vocational Expert's Testimony

Next, the vocational expert, Pamela Tucker, testified. She explained that Ms. Gomez's past work was light to medium in terms of exertional demands and ranged from semi-skilled to skilled. (R. 58). The ALJ asked Ms. Tucker to assume an individual could perform light work that did not require climbing ladders, ropes, or scaffolding, or kneeling or crawling, or reaching overhead with one arm, only occasionally required climbing ramps or stairs, or balancing, stooping or crawling, and that did not expose the person to pulmonary irritants; and further assume that individual could only perform simple, routine, and repetitive tasks, could only work in a low stress job that involved only occasional decisionmaking, and could not work at unprotected heights, with dangerous machinery, or in extreme temperatures, could not have contact with the public and could have only occasional contact with co-workers. (R. 59). The VE testified that such a person could do Ms. Gomez's past work as a mail clerk, as that work was generally performed in the economy but not as Ms. Gomez performed it. (R. 59). The VE added that such a person could also perform jobs like labeler (6000 positions in Illinois), small parts assembler (7500), and molding machine operator (2100). (R. 60).

The ALJ then added a sit/stand option to the hypothetical. The VE said that would eliminate the molding machine operator position, and reduce the labeler and assembler positions to 3000 and 2800 jobs respectively. Such a person could also be a pattern marker (2100) or production assembler (2800). They could not perform the mail clerk job as Ms. Gomez performed it, but could perform it as generally performed in the economy. (R. 61). The VE went on to explain that a person could be off task no more than 15 percent of a workday and miss no more than 1 day of work per month. (R. 63).

9

The ALJ asked whether such a person could perform any jobs if they were limited to sedentary work with a sit/stand option. The VE said there would be a limited range of jobs available, such as circuit board assembler (600), address clerk (500), document preparer (500). (R. 63).

## D.
### The ALJ's Decision

The ALJ found that Ms. Gomez suffered from the following severe impairments: "status post left shoulder rotator cuff tear; fibromyalgia; asthma; depression; and panic disorder." (R. 18). He further found that Ms. Gomez did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 18-19). Specifically, the ALJ found that her impairments did not meet listing 1.02 – covering major dysfunction of a joint, 1.04 – covering disorders of the spine, 1.07 – covering fracture of upper extremity, 3.03 – covering asthma, or 12.04 or 12.06 – covering depression and anxiety. (R. 19). The ALJ then determined that Ms. Gomez had the capacity to perform light work with a sit/stand option as long as she could be off task for up to 10% of the day; did not have to climb ladders, ropes, or scaffolds, kneel, or crawl; climb stairs or ramps, balance, stoop, or crouch more than occasionally; and did not have to reach overhead with her left arm. In addition, she could not be exposed to pulmonary irritants and would be limited to work that involved simple, routine, repetitive tasks, was low stress and involved only occasional decision making, no more than occasional contact with coworkers, and no contact with the public. (R. 21).

The ALJ went on to discuss Ms. Gomez's testimony and the medical evidence. He said that he did not credit to extent of her allegations based on his observations of her at the hearing, the medical evidence, the fact that treatment was routine, conservative, and generally effective, and that her complaints at the hearing were exaggerated compared to her complaints to physicians. (R. 27).

10

While she was taking medication for anxiety, she had never seen a psychiatrist or psychologist and does not take an antidepressant. (R. 27). As for the medical opinion evidence, the ALJ accorded great weight to the state agency reviewer who found Ms. Gomez could perform low stress work that did not involve social interactions because the opinion was consistent with the medical evidence. (R. 28). Also looking to the medical evidence, the ALJ disagreed with the other state agency reviewer who found Ms. Gomez had no postural limitations. (R. 28). The ALJ rejected the statement of Ms. Gomez's treating physician, Dr. Patel, because he did not think it indicated disability, was based on just 7 visits over 16 months, and appeared to be based on Ms. Gomez's subjective complaints. (R. 28-29).

The ALJ then determined that Ms. Gomez could perform her past work as a mail clerk. In so finding, the ALJ relied on the testimony of the VE. (R. 29). The ALJ also found, alternatively, the Ms. Gomez retained the capacity to perform other work that existed in significant numbers in the economy, again relying on the testimony of the VE. (R. 30) The ALJ cited labeler, small parts assembler, pattern marker, and production assembler. (R. 30). Accordingly, the ALJ found Ms. Gomez not disabled and not entitled to DIB under the Act. (R30-31).

## II.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402

U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It has also called this requirement a "lax" one. *Berger*, 516 F.3d at 544.

## B.
## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

Ms. Gomez finds fault with the ALJ's treatment of her treating physician's opinion, And argues that the ALJ's assessment of her credibility was flawed. And, finally, she argues that the ALJ's RFC finding failed to account for the limitations as supported by the record. There is a little

13

of each of these problems in the ALJ's opinion, but overall, the main concern is the way the ALJ considered Ms. Gomez's fibromyalgia and accompanying psychological impairments. As a result, this case must be remanded to the Commissioner.

1.

Ms. Gomez takes the stance that the ALJ didn't seem to grasp the impact of her fibromyalgia. She has a point. The ALJ did find that she suffered from fibromyalgia and that it was a severe impairment. Indeed, the medical evidence and Ms. Gomez's complaints show her to be a textbook case of fibromyalgia. As the Seventh Circuit recently explained, fibromyalgia is:

> a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals," and that it sometimes follows "significant psychological stress."

*Williams v. Colvin*, 757 F.3d 610, 612 (7th Cir. 2014) (citing Mayo Clinic, "Diseases and Conditions: Fibromyalgia," www. mayoclinic. org/ diseases- conditions/ fibromyalgia/ basics/ definition/ con-20019243 (visited June 24, 2014)). Other symptoms might include headaches, difficulty sitting standing and walking, anxiety and panic attacks. *Williams*, 757 F.3d at 612. It certainly seems to fit Ms. Gomez to a "T."

But, while the ALJ accepted the fact that Ms. Gomez had this severe impairment, other parts of his findings suggest he didn't understand its impact or accord it proper consideration. He found her complaints of pain to be exaggerated and not supported by the medical evidence. (R. 27). As indicated in *Williams*, fibromyalgia is a condition in which pain sensation are amplified. As such, complaints regarding the severity of pain would be greater than might be expected from the medical evidence. And, as Ms. Gomez's doctor – a pain specialist – reported, there was a significant

14

psychological overlay to Ms. Gomez's symptoms. The ALJ discounted this because Dr. Patel was not a psychiatrist (R. 29), but as a pain specialist working in a pain center, it seems that it is something he'd be qualified to comment on. *See* 20 C.F.R. § 404.1527(c)(2)(I), (ii); *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013)(ALJ should consider doctor's area of specialization).

So, when the ALJ faults Ms. Gomez for exaggerating her pain out of proportion with the medical findings, it suggests a misunderstanding of her diagnoses. Even if the source of a claimant's pain is purely psychological – and certainly if psychological factors contribute to it or intensify it – that does not "disentitle the [claimant] to benefits." *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004). As Judge Posner put it in *Carradine*:

> Pain is always subjective in the sense of being experienced in the brain. The question whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels. The pain is genuine in the first, the psychiatric case, though fabricated in the second.

360 F.3d at 754. To be sure, it is a difficult distinction to make. It cannot be that the credibility of a claimant who applies for benefits on the basis of these types of syndromes – like fibromyalgia, or somatization disorder – cannot be questioned. Even while woodshedding an ALJ who discounted such a claimant's complaints of pain due to lack of medical support in such a case, Judge Posner had to concede that an "unscrupulous [claimant could] exaggerate his or her pain without fear of being contradicted by medical evidence." 360 F.3d at 753.

Here, of course, there was medical evidence to confirm fibromyalgia, as described not just by Ms. Gomez's treating physician, but by the consultative physician, too. (R. 348). There is also the consistent record of Ms. Gomez seeking and being afforded treatment for her pain. She had had several epidural injections and is on a plethora of medications. She has spent years in physical

15

therapy. Granted, as the ALJ noted, she took some time off when she was "burnt out" – one can imagine that being the case – but she did return. She uses a TENS unit. She does physical therapy exercises at home including using a CPM. She has had two rotator cuff surgeries. The ALJ calls this "routine and conservative treatment" (R. 27), but really, that's an undersell for this kind of regimen. Moreover, what more additional "aggressive" treatment would the ALJ suggest for Ms. Gomez's condition?[1]

**2.**

The ALJ's handling of Ms. Gomez's psychological impairments is cause for concern as well. On the one hand, he rejected Ms. Gomez's allegations regarding the severity of her depression and anxiety because she was not going to counseling or therapy. (R. 27). But, at the hearing, Ms. Gomez

---

[1] The ALJ made some other questionable calls in his credibility assessment. He indicated that Ms. Gomez's statement that she had a bad experience with her Butrans was undermined by her report to Dr. Patel that she had good relief with the patch. (R. 27). But Ms. Gomez's story of one incident in which she had a dizzy spell after using the patch while bathing (R. 48) is not inconsistent with her reporting good relief on another occasion to her doctor.

Another reason the ALJ gave for not believing Ms. Gomez was that she was able to drive a car, use public transportation, prepare meals for her family, schedule appointments and pay bills. (R. 23). This is quite an overstatement of her activities. Ms. Gomez testified that her son does most of the cooking and about all she could do was make a sandwich. (R. 45). She sometimes struggled with hygiene. (R. 51). She is forgetful and does not pay bills on time. (R. 222). As such, it is difficult to see how her activities are inconsistent with her complaints of disabling pain, anxiety, and depression. The ALJ failed to take into account the limitations had in performing the activities he cited. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir.2009).

The ALJ also discredited Ms. Gomez's statement about his wife's limitations because he was not medically trained and was married to Ms. Gomez, making him biased in her favor. (R. 22). The first reason automatically discredits any descriptions of a claimants limitations from a non-physician and is far too sweeping a rationale. The second has been rejected by the Seventh Circuit in *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013)("The implication is that if a plaintiff or a defendant (or a relative of either—or a fiancée) testifies in a case, the testimony must automatically be discounted for bias."). The ALJ had to "ma[ke] clear whether he believed the [husband's] testimony or not, or which part he believed, or whether he had no idea how much of what []he said was worthy of belief." He said only that he took the statement into consideration. (R. 22).

16

explained that her husband's insurance would not pay for her to see a therapist. (R. 53). An ALJ cannot discount a claimant's complaints based on a lack of treatment where the claimant's treatment options are cut off by lack of insurance. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). The ALJ ignored this in his opinion. Moreover, it was not as though Ms. Gomez was receiving no mental health treatment. She was prescribed medication for her mental impairments by her regular physicians, Drs. Wiener and Patel. (R. 401, 402, 406, 409-10, 443, 447). While the ALJ claimed that Ms. Gomez did not take any antidepressants and used that against her in assessing her credibility, Ms. Gomez's prescriptions included not only anti-anxiety medication – Alprazolam and Effexor – but an antidepressant, Trazadone, as well. (R. 447); http://www.drugs.com/trazodone.html. Also, along the way, the ALJ ignored the fact that the consultative examiner found that Ms. Gomez's mental impairments left her unable to function normally in all areas. (R. 362)

On the other hand, the ALJ found that Ms. Gomez's mental impairments led to moderate difficulties in concentration. (R. 20). But, he did not account for these difficulties in either his hypothetical to the VE or his RFC finding. He limited Ms. Gomez to simple, repetitive work, low-stress work, and work that limited her interactions with co-workers and the public. Notably, however, in *Stewart v. Astrue,* 561 F.3d 679 (7th Cir. 2009), the court held that a hypothetical limiting a person to "simple, routine tasks that do not require constant interactions with co-workers or the general public" did not account for limitation in concentration, persistence, or pace. 561 F.3d at 684-85. That's fairly close to what the ALJ tried to do here. *See also Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008)(limiting person to "simple, unskilled work" did not account for moderate difficulty with concentration); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003)(mentioning

17

borderline intelligence that seriously limited the ability to understand, remember, and carry out instructions did not account for deficiencies in concentration, persistence, or pace). It would seem then, that the ALJ's hypothetical here would not pass muster.

Ideally, the ALJ would have included the concentration difficulties in both his hypothetical to the VE and his RFC. That's the preferred, fool-proof method. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). But, an ALJ can sometimes get by if he uses alternate phrasing that specifically excluded those tasks which that someone with the claimant's limitations would be unable to perform. As the court explained in *O'Connor-Spinner*, as it recounted its various rulings on this type of issue:

> We also have let stand an ALJ's hypothetical omitting the terms "concentration, persistence and pace" when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform. We most often have done so when a claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work.

627 F.3d at 619.

Here, however, the ALJ ruled out this option. He specifically explained to the VE that when he said low-stress jobs, he meant jobs that required only occasional decisionmaking. (R. 59). So moderate concentration difficulties were not accounted for. Moreover, there is nothing to suggest Ms. Gomez's concentration problems are stress-related. She testified that she cannot focus on a book while reading at home in her chair. Her doctor said her pain – which has a psychological overlay – led to her difficulties with concentration. So a limitation to low-stress does not guarantee that the VE accounted for concentration difficulties in her testimony.

A simple job that's not mentally challenging or stressful may, nevertheless, tax someone's concentration and focus. *See Kasarsky*, 335 F.3d at 544(". . . the length of time it takes someone with borderline intelligence to learn a job is not the same as the ability of that person to perform consistently once trained."); SSR 85–15, 1985 WL 56857 (1985) ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job.").

As result, there is no way to know if one could perform Ms. Gomez's past work as a mail clerk with moderate difficulties in concentration. The same may be said for labeler, small parts assembler, production assembler, etc. Indeed, one can readily imagine a small parts assembler having to deal with a conveyor delivering pieces a worker who must then put them together, over and over, one after the other, all day. For one whose concentration waxes and wanes, or cannot persist or maintain a pace throughout the day, it is a daunting if not impossible occupation. This is why a VE needs to be informed of limitations in concentration even if an ALJ has already specified a limitation to simple, repetitive, low-stress work.

## CONCLUSION

The plaintiff's motion for remand [Dkt. #15] is GRANTED, and the Commissioner's motion for summary judgment [Dkt. #20] is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 11/7/14